USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1375 DIANE GIBSON, Plaintiff, Appellant, v. CITY OF CRANSTON, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ _________________________ Lauren E. Jones, with whom Jones Associates, Daniel V. _________________ _________________ __________ McKinnon, and McKinnon & Harwood were on brief, for appellant. ________ __________________ William F. Holt, Assistant City Solicitor, for appellees. _______________ _________________________ October 3, 1994 _________________________ SELYA, Circuit Judge. This appeal arises out of Dr. SELYA, Circuit Judge. _____________ Diane Gibson's short and stormy stay as superintendent of schools in Cranston, Rhode Island. It stands as a vivid illustration that some of life's most instructive lessons are learned in the classroom of adversity. After educating ourselves about the facts of the case, the applicable law, and the proceedings below, we conclude that the district court correctly refused to give the plaintiff's case a passing grade. I. BACKGROUND I. BACKGROUND Because the trial court took this case from the jury and terminated it by means of an instructed verdict, we summarize the facts adduced below in the light most congenial to appellant's claims. In early 1989, while serving as Assistant Superintendent of Schools in Waterloo, Iowa, plaintiff-appellant Diane Gibson applied for a job as school superintendent in Cranston. The school committee (the Committee) interviewed her twice (once publicly and once privately) and eventually offered her the post. On August 21, 1989, she met in Rhode Island with members of the Committee concerning her employment contract (the Contract). The parties signed it the next day. The Contract contained 11 sections, counting the preamble, spread over eight pages. It specified a term that ran from October 1, 1989 to June 30, 1992. The Contract contained various clauses related to professional growth, compensation, contract renewal, salary adjustments, termination for cause, and 2 resignation. It also provided for such miscellaneous items as certification, annual medical examinations, and disability protection. Article III described the superintendent's duties, stating that she shall be the chief administrator and agent of the Cranston schools and have charge of the administration of the schools under the direction of the Committee. In this capacity she shall implement, among other things, all policies approved by the Committee, provide for efficient administration of the system and provide for the performance evaluation of all administrators, teachers, and quality of the education provided. The same article stated that the parties' "respective rights and responsibilities . . . shall be as specified in Chapter 2 of Title 16 of the [Rhode Island General Laws]." Article VI of the Contract has particular pertinence in this litigation. By its terms, the article obligated the Committee to assess in writing the Superintendent's overall performance at least annually. The format and procedure for the evaluation were to be decided upon by the parties no later than 60 days after the Contract's effective date. Once an evaluation emerged, the Committee and the Superintendent were to meet for discussion of it; specifically, the Contract indicated that a meeting dedicated to this purpose would be held between February 15 and March 15 of each contract year. The evaluation was to be used in determining "if the Superintendents's Contract is renewed/not renewed." To this end, Article VI also contained a non-exclusive list of factors to be considered in the evaluation process and required that the end product describe in reasonable 3 detail "specific instances of strengths and commendations as well as specific instances of any unsatisfactory performance." At the end of the first 60 days of her reign, Dr. Gibson had not heard from the Committee regarding the evaluation process. She brought the matter to the attention of Stephen Dambruch, the Committee's chairman. Dambruch suggested that appellant develop and disseminate a proposed evaluation form. On December 4, 1989, appellant complied. On March 1, 1990, Dambruch notified the Committee that an evaluation was due between February 15 and March 15 of each year. Five of the nine Committee members responded on the form appellant had prepared. Two other members wrote letters commenting upon appellant's performance. Two Committee members kept their own counsel. In any event, the Committee never composed a unified performance evaluation. This lollygagging took place during a period of considerable turmoil. In January 1990 the Committee voted to restructure the public schools, only to reverse itself two months later.1 Spurred in part by this dramatic about-face, appellant requested that the Committee provide her with a written statement of its goals. Although a meeting was held to discuss this request, the Committee never complied with it. In March 1990 appellant became aware that the school ____________________ 1To add to the muddle, hard on the heels of the vote to restructure the school system a Committee member circulated a poll requesting teachers' input. This impulsive action ultimately led to the filing of an unfair labor practice charge. 4 system had improperly paid health benefits on behalf of former employees. She brought this matter to the Committee's attention. Dambruch and his colleagues commissioned an ad hoc committee (the AHC) to mull the problem. The AHC sought to exclude appellant from its deliberations. To compound this contretemps, an assistant city solicitor wrote to Dambruch on June 8, 1990 suggesting that the AHC might be illegally infringing on the Superintendent's administrative prerogatives and might lack the legal authority necessary to arrange for an audit of the school system's records. Eventually, the Committee retained a certified public accountant. Although the accountant completed a study of the situation, the Committee never provided appellant either with the accountant's report or with any feedback regarding the accountant's recommendations. Cranston held a municipal election in November of 1990. The electoral results significantly affected the Committee's composition. A member suggested that appellant's evaluation be completed before the newly elected members took office. The Committee scheduled a special meeting for this purpose, but appellant resigned before the meeting could be held. In her letter of resignation, dated December 28, 1990, appellant accused the Committee of violating the Contract by not providing a proper evaluation and statement of goals, and by infringing on the scope of her autonomy as superintendent. All was serene for well over a year. On June 10, 1992, however, appellant, then a citizen and resident of North 5 Carolina, sued for breach of contract in a Rhode Island state court. She claimed that the City of Cranston, acting through the Committee, disregarded duties owed under the contract, and she sought damages including the balance of her salary and benefits for the period from January 1, 1991 through June 30, 1992.2 Noting the existence of diversity jurisdiction, 28 U.S.C. 1332 (1988), Cranston removed the case to federal district court, see ___ 28 U.S.C. 1441 (1988). In due course, Chief Judge Lagueux empaneled a jury and trial commenced. At the close of the appellant's case, Cranston moved for a judgment as a matter of law.3 The district judge assumed arguendo that Cranston had not fulfilled its contractual ________ commitments, but ruled that, even so, the evidence did not permit a rational jury to find a breach of sufficient materiality as to allow appellant to cease performance and recover damages for the balance of the unexpired term. This appeal followed.4 ____________________ 2Although Dr. Gibson originally sued a bevy of defendants, only Cranston and its treasurer remain in the case. Because Rhode Island law treats a suit against the treasurer of a municipality, in his or her official capacity, as a suit against the city, see R.I. Gen. Laws 45-15-5 (1991), these two ___ defendants are in effect the same entity. We refer to them collectively as "Cranston." 3In 1991, Fed. R. Civ. P. 50 was amended to change the appellation "directed verdict" to "judgment as a matter of law." This change in nomenclature does not affect the substance of the applicable legal standard. 4Although we affirm the grant of judgment as a matter of law, see infra, we caution that in most cases a trial court will ___ _____ be better advised to reserve decision on such a motion, passing on the legal question only after submitting the case to the jury. Mid-trial directed verdicts should be the exception, not the rule. We concluded long ago that refraining from granting a 6 II. STANDARD OF REVIEW II. STANDARD OF REVIEW When confronted with a motion for judgment as a matter of law, whether at the end of a plaintiff's case or at the close of all the evidence, a trial court must scrutinize the proof and the inferences reasonably to be drawn therefrom in the light most amiable to the nonmovant. See Rolon-Alvarado v. Municipality of ___ ______________ _______________ San Juan, 1 F.3d 74, 76 (1st Cir. 1993); Wagenmann v. Adams, 829 ________ _________ _____ F.2d 196, 200 (1st Cir. 1987). In the process, the court may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of evidence. See Wagenmann, ___ _________ 829 F.2d at 200. A judgment as a matter of law may be granted only if the evidence, viewed from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome. See Rolon-Alvarado, 1 F.3d at 77. ___ ______________ Because granting a judgment as a matter of law depends upon the legal sufficiency of the evidence, appellate review is plenary. See Jordan-Milton Mach., Inc. v. F/V Teresa Marie, II, ___ _________________________ ____________________ 978 F.2d 32, 34 (1st Cir. 1992). It is incumbent upon the court of appeals to apply precisely the same criteria that constrain the trial court. See Rolon-Alvarado, 1 F.3d at 77. Moreover, ___ ______________ ____________________ judgment as a matter of law until the jury has had a chance to deal with the merits is frequently a "wise and time-saving precaution." Talbot-Windsor Corp. v. Miller, 309 F.2d 68, 69 _____________________ ______ (1st Cir. 1962). By following that course, the judge minimizes the risk that the trial will have to be replayed yet retains the power to pass on the sufficiency of the evidence in a timely manner. Of course, everything depends upon the circumstances, and in some cases granting the motion is both efficient and wise. 7 the standard of review affords no place for any deference to the district court's view anent state-law questions. See Salve ___ _____ Regina Coll. v. Russell, 499 U.S. 225, 238 (1991). ____________ _______ III. ANALYSIS III. ANALYSIS The substantive law of Rhode Island governs in this diversity case. Under Rhode Island law, a contracting party may cease performance and seek damages if the other contracting party commits a breach that is "material," see, e.g.,Philip Carey Mfg. ___ ____ _________________ Co. v. General Prods. Co., 151 A.2d 487, 493 (R.I. 1959), or that ___ __________________ "goes to the essence of the contract," Aiello Constr., Inc. v. _____________________ Nationwide Tractor Trailer Training & Placement Corp., 413 A.2d _______________________________________________________ 85, 87 (R.I. 1980). Some courts and commentators have cast the standard in terms of a "total" breach as opposed to a "partial" breach, with only the former justifying termination of a contract. See, e.g., Lovink v. Guilford Mills, Inc., 878 F.2d ___ ____ ______ _____________________ 584, 586-87 (2d Cir. 1989); Arthur L. Corbin, Corbin on Contracts ___________________ 946, at 809 (1951). Because we believe these terms constitute various ways of saying the same thing, we will use them interchangeably.5 ____________________ 5The rigid material/non-material dichotomy may oversimplify the universe of breaches. Although this case, in its present posture, does not require us to make a finer distinction, we do not deprecate the possibility that there may be an intermediate level of breach, i.e., breaches which are not serious enough to ____ warrant repudiation of the contract and a suit for damages by the injured party, but which nonetheless might constitute a defense to an action for damages brought by the party committing the initial breach. Thus, our holding that the Committee's alleged breaches were not material, see infra, does not necessarily ___ _____ betoken that Dr. Gibson would have been liable had the Committee sued her for breach. 8 Appellant invites us to rule that materiality is always a question of fact, thereby eliminating the possibility of a directed verdict where, as here, the issue is disputed. We decline the invitation. While the state supreme court has indicated that, in this context, materiality "is essentially a factual question," and that its resolution ordinarily "requires consideration of all the pertinent evidence and the conduct and relationship of the parties," Dunne Leases Cars & Trucks, Inc. v. ________________________________ Kenworth Truck Co., 466 A.2d 1153, 1160 (R.I. 1983), the first ___________________ part of this statement is a generalization, and, like most generalizations, it admits of exceptions. Though questions of materiality are usually to be determined by the trier of fact, in this case the jury, the rule is not universal. As is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law. The task of delineating which particular breaches may justify an injured party ceasing performance and bringing an action for damages is demanding, but the case law affords some insights. In Aiello, for example, the plaintiff, a contractor, ______ sued a property owner for nonpayment of installments due under a construction contract. The Rhode Island Supreme Court upheld a finding that the defendant's failure to pay installments as they came due went to the essence of the contract and, therefore, 9 excused further performance by the plaintiff. See Aiello, 413 ___ ______ A.2d at 87. In Dunne, the court upheld a finding that a dealer _____ committed a material breach of its franchise agreement with a truck manufacturer by failing to honor its promise to separate its leasing activities from its dealership operation. See Dunne, ___ _____ 466 A.2d at 1159. In its opinion, the court emphasized the presence of evidence that the leasing activities adversely impacted the truck dealership in the areas of parking, cleanliness, parts sales, and service. See id. at 1158. On this ___ ___ basis, the court concluded that the dealer's breach might be deemed material even though the dealer regularly achieved its sales quota under the franchise agreement.6 See id. at 1159. ___ ___ Despite the insights that can be gleaned from these cases, the Rhode Island courts thus far have not precisely defined what constitutes a material breach. Nonetheless, we believe that the proper analysis is informed by certain commentaries and decisions from outside Rhode Island. See ___ Michelin Tires (Canada), Ltd. v. First Nat'l Bank, 666 F.2d 673, ______________________________ ________________ 682 (1st Cir. 1981) ("In the absence of a definitive ruling by the highest state court, a federal court may consider analogous decisions, considered dicta, scholarly works, and any other ____________________ 6Although Dunne involved allegations that the defendant's _____ decision to terminate the franchise agreement had been reached without "due cause" as then required by R.I. Gen. Laws 31-5.1- 4(C)(3) (1979 reenactment), the Rhode Island Supreme Court interpreted "due cause" as turning on the materiality of certain breaches committed by the franchisee. See Dunne, 466 A.2d at ___ _____ 1157. Thus, Dunne is useful authority in connection with the _____ question sub judice. ___ ______ 10 reliable data tending convincingly to show how the highest court in the state would decide the issue at hand, taking into account the broad policies and trends so evinced.") (citation and internal quotation marks omitted). The Restatement is an especially helpful source of guidance because Rhode Island courts frequently turn to the Restatement to fill gaps in state law. See, e.g., Bibby's Refrig., Heating & Air Cond. Inc. v. ___ ____ ________________________________________________ Salisbury, 603 A.2d 726, 729 (1992); Durapin, Inc. v. American _________ ______________ ________ Prods., Inc. , 559 A.2d 1051, 1059 (1989). The Restatement lists ____________ five factors that may be considered in determining whether a breach is material.7 Other commentators have espoused slightly ____________________ 7These factors are: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. Restatement (Second) of Contracts 241 (1979). 11 different sets of relevant factors for use in determining materiality, such as the extent to which the contract has been performed at the time of the breach, the willfulness vel non of ___ ___ the breach, and the degree of seriousness attributable to the breach, expressed in quantitative terms. See 2 E. Allan ___ Farnsworth, Farnsworth On Contracts 8.16, at 442 (1990); J. ________________________ Calamari & J. Perillo, Contracts 408-09 (2d ed. 1977). We _________ believe that when the occasion arises, the Rhode Island Supreme Court will adopt some variant of these tests to determine the materiality of a breach of contract.8 In our view, the test will concentrate on factors such as those listed in the Restatement, with special emphasis, in the employment context, on the extent to which the alleged breach interferes with the duties and benefits flowing from the contract in its entirety. We need not dice matters too finely, however, for appellant's proof can meet neither the Restatement standard nor any reasonable variant of it. We explain briefly. While a material breach of an employment contract need not completely frustrate the entire purpose of the contract, it must be so important that it makes continued performance by the plaintiff virtually pointless, see Lovink, 878 F.2d at 587. ___ ______ Thus, if Cranston refused to pay appellant, or, conversely, if ____________________ 8Appellant suggests that "a breach is material if it denies a party a bargained-for exchange." We find this formulation unacceptable, for it does not reflect how significant a contract provision must be before its breach will be deemed material. 12 appellant completely withheld her services for no valid reason, the ensuing breach would reach the essence of the Contract. But that is not what transpired here. We think it is readily apparent that, under the stringent standard that obtains, the Committee's alleged breaches of the Contract are, as a matter of law, not material. The superintendent's job encompasses a complex and varied set of responsibilities. Under a provision of the Rhode Island General Laws, which is incorporated into the Contract by explicit reference, the post includes a vast array of administrative, supervisory, managerial, and policymaking functions. See R. I. Gen. Laws 16-2-11 (1988), reprinted in ___ the appendix. This elaborate compendium of responsibilities, complemented by the multifarious provisions of the Contract itself, put appellant's grievances into proper perspective. And so viewed, we are unable to see how a reasonable jury could find that the Committee's conduct involved matters of sufficient significance to constitute a material breach. Appellant's flagship claim pirouettes around the Committee's failure to provide her with a unified evaluation. Given the admitted feedback that appellant received from a majority of the individual Committee members, we cannot discern how the failure to reduce the feedback to a unified evaluation or the other shortcomings in the evaluation process could be deemed a material breach. Without the evaluation, appellant was still able to carry out virtually all of her responsibilities. She still received the overwhelming majority of the benefits to which 13 the Contract entitled her. Her mere testimony that without the evaluation provision she would not have signed the employment agreement cannot make this otherwise unremarkable provision into one that "goes to the essence of the contract." Salo Landscape & ________________ Constr. Co. v. Liberty Elec. Co., 376 A.2d 1379, 1382(R.I. 1977). ___________ _________________ The determination of materiality, like other aspects of contract interpretation, must be based largely on a standard of objective reasonableness rather than purely subjective belief. Cf. John F. ___ _______ Davis Co. v. Shepard Co., 47 A.2d 635, 637 (R.I. 1946) (noting _________ ___________ that the "true question" in determining the intention of the parties is "not what intention existed in the minds of the parties, but what intention is expressed by the language used") (internal quotation marks omitted); Pahlavi v. Palandjian, 809 _______ __________ F.2d 938, 945 (1st Cir. 1987) (commenting that "contracting parties are bound by objective manifestations and expressions, not subjective expectations"). In other words, a party cannot transmogrify a provision that, from an objective standpoint, has only marginal significance into one of central salience by the simple expedient of saying in retrospect that she believed it to be very important. Here, notwithstanding plaintiff's post hoc ____ ___ rationalization, the Committee's failure to provide a unified evaluation seems much more a matter of form than of substance. It did not in any way shrink plaintiff's major duties or deprive her of the principal benefits of her contractual bargain. Nothing about the failure betokens bad faith or an unfair course 14 of conduct. And the sockdolager is that, at the time Dr. Gibson resigned, there was a high likelihood that the Committee would soon cure its breach by providing an evaluation; a special meeting for this purpose was scheduled to occur less than one week after she precipitously resigned. Appellant's fallback position is that the Committee never furnished her with a written statement of goals. But appellant had ample contact with the Committee and its members to get a sense of the school system's objectives. Thus, as with the first alleged breach, this failure did not interfere significantly with either her duties or her benefits under the Contract. Consequently, it could not be deemed a material breach. Finally, appellant alleges that the Committee infringed upon her administrative responsibilities. She offers two incidents to illustrate her contention: a Committee member's action in sending a questionnaire directly to the faculty, see ___ supra note 1, and the AHC's attempt to exclude her from its _____ deliberations. Given the minor nature of these supposed infractions and their subsequent resolution, no reasonable jury could find that they constitute a material breach. IV. CONCLUSION IV. CONCLUSION We need go no further. Considering all the evidence in the light most hospitable to plaintiff, no reasonable jury could find that the Committee's alleged breaches of the Contract gutted it. Consequently, the court below did not err in granting 15 judgment as a matter of law. Affirmed. Affirmed. ________ 16